Your argument today is Gonzales v. Madigan. Mr. Bolton. May it please the Court. My name is Stephen Bolton, and along with Anthony Pereyka and Jennifer Hill, I represent Jason Gonzales in this appeal. I would request five minutes for rebuttal, as prearranged by us, and with the Court's dispensation, I will avoid a review of the facts given the length of the argument. Your Honors, our position is that the initial error of the District Court was that it initiated a bad standard of review in deciding the summary judgment motion. It did not apply a standard 1983 analysis. It did not even apply the factors listed by this Court in the Rudisill case going off of the Smith v. Cherry case in attempting to decide whether there was a case for liability or not. It did not even apply the standard of this Court in Hennings, where it said willful conduct, which undermines the organic processes by which candidates are elected. That is not what occurred. Instead, the Court went to an Erzat standard of publicity versus not publicity as far as being determinative of the case. As we view the case, Your Honors, in that situation, the case law does not support the District Court in that we see a clear demarcation in the case law between what the factor, the main factor that the Rudisill Court described, which was conduct that was chicanery or other things that might go on in a political campaign. Viewed from that standpoint, there's a very limiting factor upon these types of cases. No one's opening up the door to anybody as far as the courthouse door in that the actual misconduct had to be intimately related, connected with the ballot. So we see that there's a very clear demarcation there because in the Jones case, relied upon heavily by the District Court, the ballot was fine. The referenda were perfectly legitimate. They were placed on the ballot. And this Court even noted that those referenda applied to the plaintiffs as well as the defendants. In the Rudisill case, it was simply allegations that the various city officials had lied about the facts in an election campaign on a referenda that was properly on the ballot and legally on the ballot. What the Smith case teaches, however, is that when there is a fraudulent candidacy, such as we have alleged and the Court has found that the jury could so find, that is not a legitimate ballot. That is, that is, in fact, fraud intimately connect connected with the ballot. And that should be the standard of review, not whether the not whether the other participants in the in the election managed to make allegations or not. Mr. Bolton runs. It's Judge Scudder in the courtroom. What rule of law are you asking us to announce here or confirm or set forward? What rule are you asking for? I'm simply asking the court to reinforce the rules that was set down in the Rudisill case, which set down the criteria in the in the Smith case that the fraud was intimately connected with the ballot, had the purpose and effect of deceiving voters as the actual effect of their votes and had the intended result of favoring one. So if you if you're asking us to just decide it under Rudisill, how do you deal with actually asking you decided that that is Rudisill's interpretation of Smith? We are asserting that Smith is the controlling statute here. We are also stating that this is a relatively straightforward 1983 case, Your Honor, and that standard of 1983 was never addressed by the District Court. Mr. Bolton, there was a telling slip of the tongue. You said Smith is the controlling statute here. Maybe, indeed, the panel in Smith thought it was writing a statute. But these days, the Supreme Court does not understand the judicial role that way. I'm interested in the question whether Smith, as you understand it or in any other way, has ever been followed either by the Seventh Circuit or by any other court of appeals ever followed, Your Honor. I just what do you mean as a controlling precedent, Your Honor? Rudisill and every subsequent case in which anybody in this circuit has relied on Smith has distinguished it. The next question is, has any other court of appeals adopted Smith? I'm not aware of that, Your Honor. However, most what's happened is not so much distinguish it as limited to its facts. And what we would contend is that that's what it means to distinguish something. So far as I can tell, Smith has never been followed anywhere by anyone. Perhaps that suggests there's some problem with it. I don't think there's a problem with it, Your Honor, in that it strongly follows the 1983 criteria of equal protection. This court is early, and it's ironic that the Shackman cases are still here and before your honors. But in the original Shackman case, it was recognized that the candidates have a right of equal protection with regard to the actions taken towards them in an election of ballot. There's nothing new in the Smith decision that some radical departure of law, equal protection for candidates in an election is a longstanding principle of certainly of this court stemming from Shackman. So if you go back, if you go back to what you said about Rudisill, okay, Rudisill has the purpose and effect test. As you stated, how do you deal with the effect aspect of this on this fact pattern with this evidence? Well, Your Honor, it is simply the effect of the fact that the the bad candidates, if you were the sham candidates were on the ballot, they should not have been on that ballot. So what they did was they conspired to put those candidates on the ballot. And the effect was to actually have those candidates I thought in within the meaning of Rudisill, I thought when when our court talked about purpose and effect, we were talking about effect on the elect electorate. We weren't talking about effect on just the ballot qua ballot. Well, the ballot begins to happen, Your Honor, I would simply say that the ballot is central to what the effect on the electorate is going to be, which is why it is so central to the democratic process and so central to this case. It does have the effect, Your Honor, on the fact that Hispanic candidates, Hispanic voters are presented with three Hispanic candidates and one white Irish candidate in the form of the speaker. So Speaker Madigan is one white candidate versus three Hispanic candidates. It's in our our contention is and the court so found that that was a calculated effect created by the jury could find that that election of election effect was a calculated effect created by the sham candidates as fully intended. A jury could so fine. But moving on, Your Honor, our other contention, our other contention is that the without regard to the election outcome, you're saying you don't need to ask any question whatsoever about the outcome of the election. You don't need to ask any question at all about what what Mr. Gonzales. You know what he was campaigning upon. All you need to do is focus on whether there was an impact on the ballot. And then from there, you can assume an effect upon the electorate. Is that your argument? No, Your Honor, the effect, I go back to the Kuznicek case that we cited in our brief, Your Honor, where this court said that the election result, that was a case, Your Honor, which the allegation was that ballots had been spoiled. And the one of the rationales for denying liability was, well, it's only two or three ballots. It wouldn't have affected the outcome of the campaign. So it's all right. Well, this court strongly stood up and said it doesn't matter for purposes of a 1983 allegation whether the whether the conduct would have affected the outcome of the election or not. In the case law that is presented here, you have cases in which the plaintiff has specifically asked for a new election. So it's somewhat jaundiced within the case law such that the the. But this isn't a pleading issue. This is a this is a proof issue. This is summary judgment, right? Right, Your Honor. But it can be what we're pointing out, though, is that the effect of the chance upon the election is one that the jury could consider that they affected the election in that in that. But I'd also say, Your Honor, I want to make more very fundamentally, this is not a case saying we lost the election. Therefore, there's liability. The liability here occurred long before the first vote was cast in in that election by the use of the of the sham candidates so that and also our damages are not losing an election, which is somewhat what was going on in Hutchinson. Our damages are straightforward tort damages under 1983, emotional distress, funds expended. So we're not at the point that we've been making throughout the case, Your Honor, is that there is no real relevance to the actual outcome of the election because the violation existed independent of the election. Your Honor, whether he won or he constitutional deprivation there. So our point is that if you if you begin to, as the kuz as that court said, if we're going to allow misconduct to be remedied by election results, we're simply asking for people to create more shenanigans. It seems to me it's a it's a rather bad policy, Your Honor, for the courts to adopt. It's a better policy, it seems to us to say if there's a violation under under a straightforward application of 1983, then that's what it is. And the election result does not change that one way or the other does not make it and does not make it. The election result simply becomes a matter of what relief is to be granted. Is there to be a new election, which Mr Gonzalez has never requested and and does not request in this case. Um, Your Honor, I noticed that I'm down to 17 seconds, so I'll simply make my other main point, which is that we we believe that the application of the of the old very language of Jason Gonzalez placing the matter before the voters was a total distortion in that the, um, he had a right to speak out. He had no evidence. He only had uncertain. And now, counsel, you were down to zero seconds. I, Your Honor, I will therefore conclude my argument. Thank you very much, Your Honors. Thank you, Mr Scudro. Thank you, Your Honor. It may it may have pleased the court Michael Scodra on behalf of the defendants. Um, I'll begin with a couple of quick points in response to your honors questions and my colleagues responses. Um, just to address briefly, the because a case that they cite from this court in 2000 and eight. Um, just to be clear, that was a case involving voters as voters seeking to vindicate their right to have their votes counted, and the court not surprisingly concluded that under those circumstances, the ultimate outcome was not relevant for purposes of calculating damages or for the elements of the underlying claim here. As we point out in our brief, one only has to look at the damages sought and my colleague just summarized some of them, but they appear in the statements of undisputed fact Doc 2 91 at 102 to 103 and paragraphs 1 63 to 1 64. All of the damages sought involve Mr Gonzalez's role as a failed candidate. None of those would make sense as a voter, a frustrated voter or as a successful candidate. And so in response to Judge Scudder, your earlier question, I think it is. It is more than fair to say that Mr Gonzalez is pursuing his relief in this case as a candidate and not as a voter. In response to Judge Easterbrook's prior question, we certainly do not take as given that Smith was wrongly decided and like my colleague, we're not or was rightly decided. Excuse me. And like my colleague, we're not aware of any case, uh, any federal appellate decision that has followed that decision as opposed to distinguish it. And on that score, I would, I would go immediately to where, um, uh, the plaintiff went and that is to wrote a sill in 1980 decision. The court makes a number of things clear in that case. One of them is that even material misstatements that were widely disseminated, including misstatements as to the motivation behind the, in that case, the referendum item being on the ballot, that that does not rise to an equal protection violation. Instead, as Judge Scudder noted initially, there has to be an actual effect on the votes and they have to be deceived as to the effect on the votes. And Smith tells us very, very narrowly what it means to be deceived as to the effect of your vote. Are you conceding that successful deceit would be actionable? Suppose a candidate runs for office and says, I will never raise your taxes. And two years later he does. Does that mean there's now a constitutional claim against that candidate? Absolutely not your honor. And in fact, what is so makes that very point clear in saying that lies. And in that case, we're talking about lies by the, the official proponents of the measure had lied not only about their own self interest, financial interest in the bond issue, but also lied about the critical underlying facts about the impact of the issue and its importance to the municipality. So absolutely not your honor. The only, the only fiction that Smith recognizes, and again, assuming even Smith was correctly decided, the only issue that is deemed a fiction and Smith is if you are voting something for something that is not actually what you are voting for. Uh, Smith called it, uh, the, the, the court in quoting the lower court within the Smith opinion describes it as voting for a fictitious person. That is, that is what was happening in the Smith case. It's either voting for a person who doesn't exist. And so you are truly being deceived as to the impact, the effect of your vote, or as in Smith, you're voting for someone who in fact will not be the candidate will not, there is a prearranged agreement that you are in fact in voting for somebody else. Those are the narrow circumstances, uh, in Smith. That is how it has been construed by subsequent cases, including block and, uh, and run a sill. And not surprisingly under those circumstances, it has been distinguished, uh, on precisely those grounds. Indeed, at the threshold, because there is no sham candidate here, the court needn't even reach the other three elements of the Smith claim, all of which failed here. I'll, I'll pause briefly on making one more point on the sham question and then discuss briefly. I know at least two others came up in the opening 10 minutes, namely no effect on outcome. And the fact that the public knew the truth with regard to sham, just what is a sham candidate? And I think judge gutter, this goes to your initial question at the outset of the argument, what is the legal rule being asked for here? I don't think we know what the legal rule being asked for here is. And so far as even in the reply brief, plaintiffs are in my view, understandably unwilling to define a sham candidate, their own, their own client, excuse me, in the course of his deposition refers to his understanding of what is a sham candidate as a quote, highly subjective criteria. And it seems to be a mix of the initial motivation to run and some combination of the traditional trappings of a robust campaign. But this is precisely the kind of thing that if anyone is going to regulate, if there's going to be a response to what their own expert describes over the course of nearly 10 pages as a widespread spread phenomenon of of lackluster candidates being added, running, running campaigns. If there's to be an answer, it would come from state legislatures and state election authorities. But indeed we know from this record that election authorities have been unwilling to do so precisely because and this is, I would, I would direct the court to exhibit 18. I'm referring to the consecutively numbered exhibits to the statements of undisputed fact, your honor. Exhibit 18 is a wall street journal article, widely publicizing Mr. Gonzalez's allegations in the course of the primary, making the point that local election officials are unwilling to ramp up things like signature requirements, recruitment, fundraising issues, those sorts of factors precisely because they don't want to be in the business of distinguishing between real and unreal candidates. And on that score on the sham, unless there are further questions, I'll just conclude by saying that as this court pointed out in Grimes as well, which is not to be forgotten in this mix, although it's a 1985 case, as opposed to a 1983 case, Grimes says that we as courts do not want to be in the quote unquote untoward position of deciding who is a quote candidate, which is precisely what a plaintiff in this case asks. I'll move quickly to the remaining three elements, all of which fail here. And any one of which provides an independent basis to affirm the judgment below, as your honors pointed out in the earlier questioning, the public knew the truth here. Indeed, the public knew the truth, as we pointed out in our brief, even without the public knowing it. What the plaintiff is describing is a lack of things like yard signs, door-to-door visits, rallies, committees, donations, putting aside the fact that actually the record is undisputed that Mr. Barboza did go door-to-door with a flyer on his behalf and enlisted others, including family members, to do so on his behalf. Putting that to one side, what he's alleging is something that would be immediately apparent to anyone who chose to look. It's easy to see whether or not someone has yard signs and is holding rallies and collecting money. But on top of it, here, of course, as the district court correctly found, citing only a portion of the articles and media coverage in the record, the story that is being alleged in the complaint was fully aired throughout with deep media coverage, and it was precisely the allegation made here. I'll point to a particular article in the Chicago Times, Exhibit 15, which is a Chicago Times article referring to what is widely seen as inactive Madigan plants to divide the opposition. That is precisely what's alleged here, attributing it to Madigan, inactivity, and the motive behind it. All of that was thoroughly aired, as the district court correctly noted. Your Honor, I will also no longer any dispute in this case that the presence of Mr. Barboza and Ms. Rodriguez had absolutely no impact on the ultimate outcome of this case. And as I mentioned before, with regard to the damages that are being sought, if one were to look at those requests, emotional damages, costs of campaigning, and so forth, whatever it amounts to, all of them, with regard to damages, are things that would not be sought had Mr. Gonzalez been a successful candidate. And so the idea that the Smith requirement that there be a demonstrated reasonable possibility of effect on the outcome, the idea that that would not apply here simply doesn't hold water in light of the relief requested. I'll very briefly touch on the fourth failed element here, which again provides yet another independent ground for affirmance, and that is the absence of state action. Not surprisingly, federal courts have had occasion in the past to review allegations that an incumbent official was acting as a state actor in the course of campaign activities, and the courts have resoundingly rejected that theory. Campaign money is private funds being spent. Campaign activities are not, even by an incumbent seeking re-election, are not state action. And I would just commend to the court the Hustedt and Federer cases that we cite. And Knorr, by the way, is prestige, or a clout is the term used in Mr. Gonzalez's brief before this court. The Hall case from the 10th Circuit addresses that allegation squarely. There you had a county attorney endorsing, publicly endorsing, a judge for re-election, and doing so, even signing the endorsement in the ad in the newspaper as the county attorney. And even under those circumstances, the 10th Circuit rejected the notion that that state action merely because the individual at issue had clout or prestige by virtue of his state position. Finally, I'll just note that there's no need for this court to reach the issue, but Hutchinson out of the 4th Circuit, which has not been, to my knowledge, certainly remains unchallenged by any other courts of appeals. Hutchinson stands for the proposition that money damages are not available under Section 1983 under circumstances, whereas here the individual, the plaintiff, is suing as a failed candidate. And I would make the point, which I think is undisputed before your honors, that the remaining claims, the Section 1985-3 claims, and the two supplemental state law claims, rise and fall, fail certainly if the Section 1983 claim fails, the district court judge so found on page A-19, and there has been no dispute on appeal that that is in fact the case. So unless the court has further questions, we rest on our in reball. Yes, your honor. May it please the court, Anthony Parikh on behalf of plaintiff Jason Gonzalez. What we would like to point out to the court is that this is not about having an election redo. This is not about ordering a new election. This is not about any of those things. This is about civil damages that are entitled for the plaintiff to ask for and get if the jury sees it to do so. Related to their losses pertaining to, for example, emotional distress, damage to reputation, further punishment despite being granted full pardons that was constantly talked about by the speaker in this election, the appellants or plaintiff complaint is sufficient to state a cause of action. Abstention is not appropriate in this case, and the district court must be reversed and remanded to allow this case to proceed to trial. Judge Canelli in two important sections of this something like 20 page or 19 page order stated on page 10 in his opinion that quote, to put it succinctly, jury could find that Barboza and Rodriguez purported candidacies were orchestrated by Madigan's associates working on Madigan's behalf. End of quote. Judge Canelli further found on page 16 of his decision that the quote defendants engaged in deliberate effort to interfere with voters decision making. End of quote. So clearly as far as the granting of a motion for summary judgment on an issue that the judge, district judge Ray Suespante would be, I think, and I argue to this panel, a reason to reverse and remand this to the jury. The issue of the state action, members of the panel, no one can dispute that speaker Madigan, who is the speaker of the house for 37 out of 50 years, last 50 years, who has been the, and is the chairman of the democratic party, a person who was a state commitment, who was on the democratic national committee, who is a state representative, local commitment of the ward, who is the 22nd district state representative, has power and state action that has been shown in the recent investigations, which are part of the grand jury that the U.S. attorney is investigating involving appointments to RTA, Metra, Pace, county, city, Chicago public schools, Chicago police department, all of the branches and in his respective positions that he holds to try to advance those that he wants to advance on his behalf. In this particular case, he used those same state actors who are, again, like Shawda Kramer, for example, subject to a subpoena to testify before a grand jury, and that's grand jury 14GJ393. I cannot see any conceivable relevance of this to your argument. We do not engage in argument by smear. The fact of the matter that I'm trying to convey to this panel is that speaker Madigan, the principal defendant in this case, used the power that he various state and local positions to solicit, recruit, circulate petitions for, pay for the printing of the petitions, pay for the notaries who notarized them, and circulate them out of his 13th ward office for both Barboza and Rodriguez to commit fraud on the ballot, and that's what he did. That was the design. That was the plan. They executed a plan, and they succeeded in diluting the vote in a district that's 70% Hispanic. The 14th Amendment Equal Protection Clause, Section 1983, provides for damages. We're not asking for a redo of the election. We're not asking the court to nullify the elections. We're simply asking to reverse and remand the district judge's ruling here and allow this case to be presented in full to the jury. Mr. Rodriguez, Mr. Gonzalez, the plaintiff in this case, when he was talking about and exercising his First Amendment rights as a candidate to address the electorate, didn't know that all of these people were involved, didn't have time to investigate. This was in weeks or days leading up to the election. So yes, the issue was brought up, but that's his First Amendment right as a candidate to bring it up. That doesn't negate the fact that the fraud was committed on the ballot way before Mr. Gonzalez knew anything about that. In fact, you know, the fraud was conspired about and cooked up months before these candidates were placed on the ballot, and it was done by— Thank you, Mr. Pereyka. Your time has expired. Thank you. The case will be taken under advisement.